Good morning. Jody Weiner on behalf of plaintiffs. Mr. Kanbar apologizes for not being here. He was here with me on Tuesday, but had a long planned trip that he had to take to Texas. But may it please the Court, the plaintiffs ask for this opportunity to address you because we feel that a very significant principle of California law is at stake in this case, and that the plaintiffs have suffered from serious errors in the trial court that we're asking this Court to correct, while at the same time asking you to reaffirm a long-standing rule. And the rule is that when an agent breaches his or her fiduciary duty by secretly giving away the principal's money against the principal's specific instructions, in this case $611,000, the principal is presumed to be damaged in that amount that was given away, and he has no further burden to prove. Why didn't you tell Judge Walker that? That's a good question. I – hindsight is always 20-20, Your Honor. What? Hindsight is always 20-20, Your Honor. I was not trial counsel, and I believe that the basic rule before a good judge who would have been responsive to it, the other counsel, your previous associate, doesn't raise the issue. I totally agree. That's the end of it, isn't it? No, it's not in this particular case. Why? Well, because I believe that the case law is very clear that claims are waived and not arguments in support of that. This is an issue of pure law, Your Honor, and it's an issue that under federal law, I believe, and state law, involving the correct allocation of the burden of proof, if a claim such as the claim that was raised here, breach of fiduciary duty, is pled and proved, then any arguments that were not brought in the lower court are not waived based on the law. I don't believe even counsel for the other side really disagrees with that, because the cases that they – We'll see about that. Well, the cases that they cite, Your Honor, pretty much say the same thing. And, in fact, they make a statement in their brief at page 25 that this is an argument being pressed by us that was not pressed. And it's pretty clear that Guzman and their case, the Steambath-Holding case, and Bolaris, which we've cited, clearly says that in this particular case, if it's an argument in support of a claim that was pressed and proved, then it's not waived. And directly to your point, Your Honor, if this were the mistake of counsel, the fact of the matter is, in this particular instance, if this were such a mistake that would lead itself to malpractice, the point that we are here now and that the issue, it's now our possibility and your province to reverse this mistake. And I totally agree with you, because the more I got into this case, the more it became pretty clear to me, yes, Judge Walker is an extremely competent judge. And I believe that had he had those authorities in front of him, the outcome would have been different. What you're saying essentially is what happened here was that the wrong, the fiduciary wrong was proven, and the question was what are the damages, if any. That's correct. And you have a legal argument about why that – first of all, is your legal argument I seem to be a broken record today. But is the presumption or a presumption or a – or is it really just a rule of law that if you direct an agent to do something and he doesn't do it, that's it? I believe it's a clear presumption of damages based upon the purpose of the law. You don't mean presumption. You mean – No, it's a finding. It's actually – I mean, he's found all of the elements. The only question that's being raised by counsel is damages are an element of this court. The fact of the matter is, and I think if you look at – But because you're arguing for a per se rule, there's no facts that would have made a difference. So the fact that you're not – the argument wasn't made didn't shape the trial in any way except maybe making it somewhat redundant. Well, I agree with you, yes. Under law, that's correct. But I think Judge Walker was straining because he didn't have those – that rule in front of him. I believe he was straining to find what we see now was actually contrived consideration because there was no consideration for this money. This was an incidental benefit. And, in fact, Your Honor – Well, there might have been – I mean, I don't think it benefits you to be arguing with him about the facts. You have a – No, no. I agree. Well, except for the fact that I think that the issue became for Judge Walker in his finding, clearly he says that he found, based upon an arbitrary date in the record, which was not a date of payment. He says that these payments were made on this date, so they secured future benefits. That's an implication that there was consideration for these. I'm agreeing with you, Your Honor, that in the first instance, the matter should have ended right then and there. The breach occurred. The agent deceived his principal. As a consequence of the agent deceiving his principal, he gave away $600,000 unnecessarily. This – I'm sorry. When I looked at St. James, it seemed to be a case about self-dealing. And all the other cases I found on this issue, the burden is on the plaintiff to prove damages. And St. James seemed limited to those particular facts. Now, there was no allegation of self-dealing here that I saw, at least in the transcript and those materials. Actually, Your Honor, you raise a good point. And I think if you look at the line of cases that we have today, going all the way back to the 40s through California Supreme Court and up until now, and particularly the Kerchein case, it's also part and parcel of something else I think should have been raised in the trial court, Your Honor. And that is this question under the restatement of agency. It's very clear, and we cited this in our brief, that this was not in this particular case self-dealing in Kerchein as it was in most of the other cases, because I looked very hard to try to get to the point that you're raising right now, which is how do we assess this wrong and this transgression if he didn't personally benefit? And, in fact, he did. We make that allegation that all of the parties benefited. But this was a gratuitous payment. It was not something that was ever bargained for. And to go specifically to your point, Kerchein did involve not self-dealing, but, in fact, Mr. Kerchein gave the commission to a third party who was a third party agent. So he didn't self-deal. He didn't get the money. He gave it to the other party. I mean, the only finding here on as to liability, and here I think you are going to be stuck with whatever was done below, was on concealment, essentially. Yes, there was a finding of that. But that was all there was. I beg your pardon? But that was all there was. Well, no, there was. Wait a minute. It was concealment only in the sense it wasn't brought to him as attention. But it was written right into the contract. The closing was. Yes, but it's clear, and the Court found. He read the papers. He would have known. But it's clear, and the Court found, that because of their relationship being a longstanding one and because of Mr. Kanbar's habit, and this is the point, Your Honor, that he trusted this individual explicitly because he was not in the habit of reading those. And the Court found specifically that because of the nature of their relationship, it was a material concealment from Mr. Kanbar. It was a breach of the duty of candor, right? And that was his finding on that issue. Well, he said he should have told him. I mean, it's clear in the record. There was no self-dealing finding. No, that's correct. And that's why I believe it is incumbent upon this Court to reverse this case because of the fact that this entire line of cases that does not require self-dealing was not brought to the Court's attention. And had he had this before him, I believe he would have done something differently. I think it's very instructive, if I might, to say one thing about closing arguments in this case. In the transcripts from pages 513 to approximately 516, there is a discussion that's very informative between Judge Walker and counsel for Mr. Kaufman. During that indication, Judge Walker says particularly to counsel in the first instance, I believe that these fees, and interestingly, he only talks about the two fees. That the – well, let me get to that in a second. What Judge Walker said was to counsel, I believe that actually these fees were paid in support of the entire transaction. They were therefore within the good business judgment rule. However, I also see that Mr. Kaufman should have told Mr. Kanbar about these, and therefore that was wrong. And I would have – Right. So it's a breach of the duty of candor, but not – and not only was it not a breach of the duty of self-dealing or non-self-dealing, but it was also not a breach of the duty of obedience, right? Oh, absolutely wrong. I don't – I disagree. But that's not what he found. Well, I don't think it even came out. In fact, he – He didn't actually find that there was a direction. I mean, there's a slight difference here. He didn't say Mr. Kanbar told him not to do this and he did it. He said he knew enough about Mr. Kanbar to know he wouldn't like this, and he should have told him. In fact, I – with respect, Your Honor, I believe that the duty of loyalty was clearly breached. Now, because of the duty of loyalty, Your Honor – Judge Walker said that. I believe he – it's implied in his finding. Implied in it. Well, what's the strongest statement from Judge Walker on the subject? If – because Kaufman – this is directly from his finding at page 35 in the record, paragraph 118. Because Kaufman knew that Kanbar did not believe in paying professional bonuses, he was under a duty to inform him before paying unrequested consulting fees that were, in fact, bonuses of $200,000 to Feldman, $400,000 to Snyder. By paying the consulting fees to Feldman and Snyder without first telling Kanbar, Kaufman breached his duty of candor. Now – Breached the duty of candor. That's correct. But not a duty of loyalty. Well, I would think they go hand in hand, Your Honor. And I think if you look at the testimony, which the Court did not specifically say, but is in the record, there was testimony that particularly – and the Court found in the case of Feldman, because he was his lawyer, already under – under retainer for a $500,000 fee to close the same transactions, that the Court found that in that case he deliberately kept it from him because he knew he would have gone through the roof. So to me, that represents a duty of loyalty. That was another thing I was going to ask you. There actually was no finding of deliberately, right? Well, I don't see that – I would have to say that that's correct, that I can see, but I don't see that it makes any difference. But it occurred to me that it might make a difference whether it was intentional or negligent in terms of whether it gives rise to the St. James-like rule. Right. And if it was just an oversight, it may be a breach of the duty, but why should it give rise to a St. James-like rule? I thought about that a lot. And to be honest with you, my feeling is that if the Court had looked at this and seen these cases, maybe the issue really was about materiality. And if it had been something that had been part of the transaction, then I could say to you, well, it really wasn't material. And as a consequence, it's not – but he said he had to tell them. But now you're getting into issues as to which the failure to raise the issue matters. In other words, the only way it seems to me that you survive when the fact wasn't raised, when the issue wasn't raised, is if you don't need any facts, additional facts or fact findings. I agree. If you need the additional facts or fact findings, you're toast. So the question is – I feel warm enough already. But can I ask this question of the Court? Is there ever a time when giving away or breaching your duty of candor, concealing something from your principle can ever be done at the same time as exercising good business judgment? I don't understand how those two things can come together. And I think that's the crux of this matter. And if you look at the argument the Court has – What does good business judgment have to do with this? I'm sorry? What does good business judgment have to do with this? Your basic position is – I mean, sort of premised on the duty of obedience more than candor. But you'd say, look, if I hire an agent and I tell him don't pay any bonuses and he pays bonuses, I don't care what happens with regard to whether it's good for me or bad for me. I told him not to pay bonuses, so I get the money back that he paid in bonuses. That's your position. Absolutely. Good business judgment has nothing to do with it. Well, that's what – but unfortunately I agree – I totally agree with you, but unfortunately that's what the Court did. And that's why we're here. The question is whether that rule applies – it seems to me the hard question is, does that rule apply to the duty of candor, not the duty of obedience, and not the duty of loyalty, and not the duty of self – of refraining from self-dealing? I believe it does, and I believe the Court found that it did. And I believe where the Court went astray was it then said, after you do this, however, we find that you got some benefit out of this, and that's why I'm bringing up the good business judgment rule, because the Court said because the entire transaction worked and you got some incidental benefit out of what your agent – based on his transgression, therefore you're entitled to some kind of an equitable set-off for the amount of money he got. And to me that goes way into exactly the reason we have this rule. How can you allow a tort fees or an equitable set-off based upon the overriding thing? Because you're basically saying that you're asking with respect to the judge to say it's okay to breach the duty of obedience, breach the duty of candor to your principal, so long as it's good for the deal. Okay. You're almost out of time, so I assume we have some time. May I reserve a few minutes? Thank you, Your Honor. Good morning, Your Honors. May it please the Court. I represent the appellee, Henry Kaufman, in this matter. I think the Court really focused on the issue here. There's no evidence that Henry Kaufman – I'm sorry. Could I ask you really to raise your voice? You know, I asked counsel earlier in another case, and she said, oh, yes, I'll raise my voice. But in about two minutes she forgot to do it. And similarly, if you go too fast, you're trying to communicate with us. Take it slowly. Speak loudly if you want to get your message across. Absolutely, Judge Noonan. You might want to try putting the mic a little closer. I have a cold, so I think I sound like a frog right now. Go slowly and keep up the loud speech. Okay. My client, Henry Kaufman, did not actively conceal payments to Mr. Feldman and the Snyders. The record is clear. These fees were disclosed, or, as plaintiffs admit, they were memorialized in a November 8, 2005 purchase agreement. But the court discarded that and said, you knew that Kanbar signs things without reading them, and so I'm going to say this is a failure to disclose. Absolutely. The court said we should have done a better job disclosing because of the 40-year relationship between these parties. We knew that Mr. Kanbar didn't look at documents, that he just signed anything put in front of him, that he was a brilliant entrepreneur, he was a brilliant inventor, not such a great businessman. We knew that. That's what the court concluded. We don't dispute that. But there was no active concealment, and the reason that that becomes an issue here is because of St. James. And I think the court was really focusing on that, that in St. James, the rule seems to be if there's active concealment of a payment to a third party, then the agent can be liable. But I disagree with Appellant in his assertion that this is some kind of conclusive presumption. Even in St. James, there was a consideration of whether or not the church could have received the same benefit if the payments had not been made to Hallian. We maintain here, and the court concluded, that Mr. Kanbar could not have received the same benefit if these fees had not been paid. Now, Mr. Kanbar admitted, and the court found, that Mr. Kaufman never stole his money or had or otherwise obtained any financial benefit from this transaction. But despite these admissions, Mr. Kanbar says, in addition to the tens of millions of dollars in profits that my client earned for him for free, he should, in addition, recover $600,000 in fees that were paid out by Mr. Kaufman for his benefit. Well, there is some information that it may have been to curry favor from these people on behalf of Mr. Kaufman, because Mr. Kaufman was going to be living there, and he was all involved in the Tulsa community now, and he was kind of, these were big deal people in the Tulsa community, and he got some benefit from it as well. But Mr. Kaufman made clear, and the court agreed, that the real benefit, yes, these were important people, but the reason that we care that they were important people is because they were able to help us find tenants for our buildings. We went in and bought a third of the real estate in Tulsa. We needed to be sure that we were going to be able to get good tenants in these buildings to make sure that we recovered a profit on the investment, and that's what the court concluded. The court said, Mr. Feldman and his wife had connections that helped us find tenants. The Snyders had connections that helped us obtain discounts on these buildings in excess of the $400,000 fee that we paid. So there was evidence that the court found more persuasive that there was a benefit incurred from the payment of these fees. Now, the court made a finding that Kambar got value for this money, and I don't hear opposing counsel, or maybe I did, but the main argument is not that that was a clearly erroneous finding. The focus is, is there a presumption that that money has to go back to Kambar because the money was paid out in violation of the duty to disclose? Now, St. James provides some support for that, and my concern about St. James is what's the basis for the St. James rule? You were saying something about active concealment. I saw something more about self-dealing. Why is St. James different from the situation here? Is it the active concealment, and that makes it different than every other case? Because there was certainly a breach of the duty to disclose in both cases. Yes. The distinction, I think, in addition to this whole idea of self-dealing was that there was active concealment here. And what do you mean by active concealment? Because there certainly was concealment of these payments. There was concealment in the sense that the court concluded here we could have done a better job of making Mr. Kambar aware of the fact that we made these payments. But it's not like we told Mr. Kambar we're not going to pay any consulting fees and then we paid them. Well, I guess two questions. Obviously, to have told Mr. Kambar after the fact wouldn't have accomplished anything. I thought that what Judge Walker was really saying is you should have told him in advance. You should have said I am planning to make these payments before he made them. So whatever turned up in the actual final documents is not really the point. I would respectfully disagree. In St. James, there was a great deal of attention placed on the fact that the individuals that Kajurkian, who received no benefit, that he actively told the church that no commission was going to be paid, no broker's fees were going to be paid, and then they were actually paid. So you're really saying misrepresentation. You're drawing a different distinction. It's not active concealment meaning purposeful, but active meaning lying. Exactly. And that would make sense for the holding in St. James, that if you're actively lying, then we're going to presume that probably there's some harm coming to the fiduciary or you wouldn't be lying. But your other argument, as I understand it, which may be borne out by St. James, is that St. James is not a per se rule, but a presumption, which is the language it uses. And it did look into the question of whether there was a fair inference that had he known when he wasn't told, they could have gotten the same benefit in another way. Exactly. So then we then circle back to the question of does it make a difference if the issue wasn't raised, because in that theory it might make a difference if the issue wasn't raised. Well, we obviously argue that it does make a difference if the issue wasn't raised. But it only makes a difference if it could have affected the facts or the fact finder. Right. And if it's shifted of a burden of proof, then it could make a difference. Right. We would argue that St. James is completely inapplicable, that the general rule that the fiduciary must always prove damages applies here. But if the court disagrees with that assessment and says, no, we need to apply St. James, Of course. I mean, that puts the question the wrong way. Of course the fiduciary has to prove damages. But the question is whether damages, you gave my money to somebody I told you not to give it to, give it back to me, is sufficient proof of damages. Well, is it sufficient proof of damages if it's clear that a benefit was conferred on the fiduciary? Well, ordinarily I would think in a fiduciary context, yes, because the whole point of fiduciary responsibility is that you're supposed to be doing, you're acting on behalf of your, I mean, suppose this guy had decided that it was really a terrific idea for this company to, I don't know, go do something that he was specifically told not to do. And he can't run around saying, well, that's just fine because it turned out to be a good idea. Well, but where's the harm to the fiduciary? Suppose somebody said, don't buy any diamond mines in Africa. I don't like the way diamonds are produced in Africa. And he goes and buys a diamond mine in Africa and makes a gazillion dollars. He says, I'm sorry, I'm damaged. I don't want to own a diamond mine in Africa. It's not the way I want to do. Okay, sell it. No. I want my money back. You have no right to do that. I don't want, just by going and buying a diamond mine in Africa, you've breached a fiduciary duty to me. I don't want any part of diamond mines in Africa. But we're still looking for harm. And if you make a term. The harm is that I own something I don't want to own. And his harm was that I was giving money away when I object to doing that. But he received a benefit. So he might have had nominal damages. Is that what you're trying to say? In Judge Berzon's hypothetical with the diamond mines and the concern, there might still be nominal damages for that breach? I don't think that there would even be nominal damages because we're looking for an economic harm. And there is. And maybe you're looking for a non-economic harm. Well, look at it this way. Both the Sniders and Feldman kept on giving services for two months after the bonuses were given. Yes. Now, those services probably had some value. But Judge Walker did not determine that value. And perhaps we should send it back to let him determine what the value of two months' help from those people was worth. Because they both worked for nothing for the ten months of the year. It's a little hard to believe that two months were worth $200,000 and $400,000 at that time. I mean, it's just a guess, perhaps a wild guess by the judge. But there was some factual evidence to support that. Well, he didn't actually find, in fact, that there was. What he found was that Canbar didn't prove that there wasn't any value. Well, but he also concluded, at least implicitly, that Kaufman's testimony that Canbar received a benefit was true. And if we get into this factual determination, then I would argue, well, that's been waived, because now we're talking about facts, as the Court said previously. If this becomes a factual issue ---- But did he determine that he received a benefit or just that he received a benefit? He got value, but a specific value. Did he get it? Well, he said that there was a specific value. But we don't know whether he didn't give a value for that. Well, at least as to the Snyders, he said, look, we know that there were discounts negotiated on buildings that were in excess of the $400,000. He didn't calculate them. No, he just said we know that they were in excess of $400,000. But he didn't know that they wouldn't have done it anyway, because they were before that doing it anyway, right? See, that's what's odd here. First of all, Feldman was paid or was supposed to be paid. I don't know what finally happened. And apparently Canbar took some of the set off and didn't pay his bills, and I don't know what happened to that. It's not in the record. So the inference that Feldman wouldn't have done it anyway when he was billing for his time seems a little strange. The other people were doing it for free before that, and they had their own motives for doing it. But there's no indication that they would have continued to do it. Or that they wouldn't have. I mean, what's strange about this case, and this maybe should be your answer, is that there was a stipulation to try it with two witnesses. I mean, what you really would want to do is hear from the people as to would I have done this or wouldn't I have done it. But the stipulation was not to do that. So we don't have a clue. Really? We only have the evidence that's in front of us that Judge Walker considered the fact that Kaufman said that he received certain benefits, that the Snyders paid out certain sums of money, that they negotiated certain discounts, and that Feldman located tenants, which would not be a typical thing that you would do as an attorney. And for that, he thought that the court concluded that because there was a continuation, the payment was made on November 8th. But what's the answer to my question? Your question is was there evidence. And the court concluded that, yes, there was. That because they continued providing services up until the last building. But I'm asking you a different question. Okay. Was there evidence or a finding as to whether these three people did the same thing before they got the bonuses that they did after they got the bonuses? There wasn't a real delineation of the timing. I mean, the court made a conclusion that because they continued purchasing buildings. Okay. I understand. But do we know in the record whether they – I mean, we know that Snyder walked through all the buildings, so that had to be before. Well, not necessarily, because we continued purchasing buildings after November 8th. Yes, but some of it was before. Some of it was before, yes. Okay. So do we get to that question? I mean, if we don't agree with the argument that there's a presumption that the bonuses paid out in breach of the duty of disclosure are automatically go back to Kanbar, aren't we getting into the area where the claims were not raised before the district court? Can you let us know what your position is on that? Our position would be yes. We are getting into the area that these were not raised. These were not considered by Judge Walker. And certainly would have been. So essentially your position on that question is that insofar as it's an automatic rule, that we can decide whether it is or isn't an automatic rule. But if it's not an automatic rule, then they waived it. I couldn't have said it better. All right. You're out of time. Thank you very much. Thank you. Thank you. Why isn't St. James a non-automatic rule? Well, the fact of the matter is, Judge, I think that you – there seems to me to be a difference between what Judge Akuta is saying and what you're saying, Judge Berzon, and that is you're telling me I'm toast if I bring up any of these issues about facts because they're waived. And I'm saying to you that that's what their discussion is about, and we did say that, because – and I don't want to – I'll save that for the last two minutes because I'm going to read something to you that maybe it will make me toast, but I think it explains this. But in the first instance, whether or not it's an automatic rule or it's a presumption, the fact is we were left with the burden to prove that amount of money, and it should have been the other way around. So whether you find this to be an automatic rule and, okay, we were harmed based upon the act, therefore – You're arguing that you wouldn't – that I'm wrong and that even – that there shouldn't be a waiver even if it's a non-automatic rule because the burden was wrong. Well, there's no question that the burden should be – and that's really what those cases say. So regardless of whether you call it a presumption or an automatic rule, Kauffman was the tortfeasor. Kauffman should have proved at that value whatever it was. But there's a real severe difference between the two just in terms of what the philosophy behind it is. I mean, one of them is just a burden shift, and the other says fiduciaries can't do this. Oh, I totally agree. And I – again, I bring to your attention the fact that if Judge Walker had these cases in front of him, we might not be standing here. So let me just bring to the second point that goes to the issue of the facts because I think this is really where the case went south from Judge Walker's point of view. This is what he says. If Kauffman had paid the unrequested fees after he had utilized the services, the fees would have been paid and he would have received nothing in return. Judge Walker is instigating, insinuating this issue of consideration where it's really irrelevant. He says, but because the fees were paid on November 8th, as compensation for ongoing services, they secured the services for future purchases. The fact is, Your Honor, first of all, the court assumed, and the record is clear on this, based on absolutely no evidence we can find that the date on which these bonuses were actually paid, because they were not paid on November 8th, that is clear. It did not make any difference to any one of the recipients or to Kauffman when these bonuses were paid. And the record does contain testimony from Kauffman at page 114 where he says, which is ER 136, I gave them the money for all they had done. Judge Walker assumed that this date was the date they were paid, when it's the date, Your Honor, of, in fact, the ---- What date were they paid? They were paid. Kauffman also testified that he wasn't sure when they were paid, probably in early December, which is also at the record in the excerpts at 136. Because this was not a closing statement, it was a purchase contract. And as we know, the bonuses were most likely not even paid until the closing took place, which the contract says could have gone until December 30th. Okay. You're out of time. Thank you very much for your arguments. I'm sorry. Thank you. The case of Kanbar v. Kauffman is submitted.
judges: Noonan, Berzon, Ikuta